```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
KENNETH A. BROWN,                                    :
                                                     :      08 Civ. 5893 (GWG)
                Plaintiff,                           :
                                                     :      OPINION AND ORDER
        -v.-                                         :
                                                     :
COMMISSIONER OF SOCIAL SECURITY,                     :
                                                     :
                Defendant.                           :
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

  Kenneth A. Brown brings this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI") disability benefits. The parties have consented to this matter being determined by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Both the Commissioner and Brown have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons stated below, the Commissioner's motion is granted.

I. BACKGROUND

  A. Administrative History

  Brown applied for SSI benefits on March 28, 2003, alleging that he suffered from "chest pains [and] breathing problems due to sarcoidosis" as well as pain in his arms, shoulders, and stomach, and breathing problems, see Administrative Record (annexed to Answer, filed Dec. 16, 2008 (Docket # 6)) ("R."), at 71, since May 24, 2001, R. 63, and as a result was unable to work,[1]

---

[1] While Brown states his disability consists of "sarcoidosis, [and] chronic lung disease with emphysema," see Complaint, filed June 12, 2008 (Docket # 2) ("Compl.") ¶ 4, he did not raise chronic lung disease with emphysema as a basis for his claim before the Social Security Administration ("SSA"), see R. 70-71. Also, in his complaint, Brown now alleges that his disabilities began on December 31, 2003. Compl. ¶ 5. Because these matters were not raised

R. 71. Prior to applying for disability benefits, Brown was employed as a delivery person for various employers from 1988 until May 24, 2001, and again on a part time basis at a clothing store beginning in 2004, working about three days a week. R. 81, 218, 223-24. As part of his application for SSI benefits, Brown submitted records from several doctor's visits, including records from visits to his treating physician, Dr. Reynaldo Alonso, from June 11, 2001 through February 14, 2003. See R. 110-37. He also underwent medical evaluations by two consultative physicians hired by the agency, Dr. Peter E. Graham, R. 138-49, and Dr. Kautilya Puri, R. 193-99.

On May 6, 2003, Brown's application was denied by the SSA. R. 27-30. He then requested a hearing before an Administrative Law Judge ("ALJ"), R. 31-32, which was held on July 25, 2005, R. 215-25. On December 16, 2005, the ALJ found that Brown was not disabled. R. 15-26. The Appeals Council denied Brown's request for review on February 12, 2008. R. 7-10. Brown then timely filed the instant action.

       1.     Brown's Medical Records and Reports

On July 11, 2001, Brown sought treatment from Dr. Alonso, complaining of left-side chest pain, particularly with deep breathing. R. 128, 136-37. Dr. Alonso's examination revealed that Brown was not in distress, that his lungs were clear to auscultation, and that his heart rate and rhythm were regular. R. 128. In addition, Brown's abdomen was found to be "non-tender" and "non-distended," and his extremities were normal. Id. Dr. Alonso diagnosed Brown with benign essential hypertension, possibly as a result of alcohol abuse, and prescribed Altace. Id.

---

before the agency, we cannot conclude that the agency erred in its failure to consider them. Thus we consider solely Brown's claim that he is eligible for SSI benefits based on his sarcoidosis; the pain in his chest, arm, shoulders, and stomach; and his breathing problems.

He also advised Brown to continue taking Prilosec for peptic ulcer symptoms.  Id.

On August 22, 2001, after an x-ray was taken, a radiologist, Dr. Michael Shapiro, indicated that Brown's heart size was within normal limits, but that there was interstitial disease in his chest with nodular change, and diagnosed Brown with "mild degenerative disease of the thoracic spine" and "enlargement of the right hilum suggesting adenopathy with interstitial disease," which may have been related to sarcoidosis.  R. 159.  Dr. Shapiro also noted that his findings were unchanged when compared with an x-ray taken in July 1996.  Id.  On this same day, Brown was also seen by Dr. Alonso.  R. 127.  Brown complained of epigastric pain, which was exacerbated by alcohol.  Id.  Dr. Alonso instructed Brown to stop drinking and to continue taking Prilosec.  Id.  Brown indicated that he had stopped taking Altace at this time.  Id.  Brown's lung, heart, and abdomen functions were normal.  Id.  Finally, test results taken to assess Brown's sarcoidosis were normal, and Dr. Alonso found that his sarcoidosis was "unlikely active."  Id.

On September 19, 2001, Brown saw Dr. Alonso again and complained of sinus congestion.  R. 125.  Brown's ears, lungs, heart, and abdomen were clear and normal.  Id.  Dr. Alonso diagnosed Brown with allergic rhinitis due to pollen and instructed him to take Claritin. Id.

Brown returned to Dr. Alonso on October 25, 2001, complaining that he had experienced intermittent diarrhea, cramping, and a fever for the previous three days.  R. 123.  Dr. Alonso diagnosed Brown with colitis, enteritis, and gastroenteritis caused by a viral infection and prescribed no treatment.  Id.  Brown saw Dr. Alonso for a follow-up examination on December 21, 2001, where he complained of having anxiety and sleep problems.  R. 122.  Brown was

prescribed Paxil. Id. In addition, Dr. Alonso noted that Brown's colitis, enteritis, and gastroentiritis had improved. Id.

On February 26, 2002, Brown returned to Dr. Alonso, presenting signs of intermittent wheezing. R. 120. An examination revealed that Brown's lungs were clear, and he was not in any respiratory distress. Id. In addition, Dr. Alonso noted that Brown's gastrointestinal problems and his anxiety had been resolved. Id. During the examination, Brown's blood pressure was elevated, which Dr. Alonso attributed to Brown's continued drinking. Id.

On June 5, 2002, Brown sought treatment for shortness of breath. R. 118. The shortness of breath was intermittent and was not accompanied by wheezing. Id. A physical examination did not reveal any significant findings for the nose, throat, or lungs, and Brown's extremities were normal. Id. Dr. Alonso also ordered a chest x-ray to see whether there were any signs of active sarcoid. Id. Brown returned on June 24, 2002 because he was having upper back pain, as well as intermittent radiating pain to his neck and left arm. R. 116. Dr. Alonso noted that Tylenol 4 relieved Brown's pain completely, but also referred him to a cardiologist for evaluation. Id. A follow up on August 28, 2002 revealed that Brown was doing well, with pain "at times," but that he had not seen a cardiologist. R. 114.

On October 25, 2002, Brown complained that he felt epigastric pain and tasted blood. R. 112. Brown also stated that he had stopped drinking and that he was taking Prilosec daily. Id. An examination of Brown's lungs, heart, and abdomen revealed no changes from prior examinations, and Dr. Alonso recommended that Brown continue to use the Prilosec. Id.

On July 29, 2003, Dr. Alonso performed an assessment of Brown's ability to do work-related physical activities. R. 151-54. Dr. Alonso found that Brown was able to lift and carry

twenty pounds, and that his walking, standing, sitting, pushing, and/or pulling were unaffected by the musculoskeletal chest pain from sarcoidosis. R. 151-52. At the assessment, Brown was found to be able to occasionally climb ramps, stairs, ladders, ropes, and/or scaffolding; kneel; crouch; crawl; and stoop. R. 152. However, Brown was unable to balance. Id. Brown's manipulative functions, including reaching, handling, fingering, and feeling, as well as his visual and communicative functions were not limited. R. 153. In addition, he was not limited by environmental factors, including dust, vibration, temperature, fumes, odors, chemicals, and gases. R. 154.

On February 22, 2005, Dr. Alonso completed a "Return to Work or School" certification indicating that Brown was under his care from January 26, 2005 until February 22, 2005 for sarcoidosis and severe pain. R. 186. Dr. Alonso stated that Brown was able to return to work as of February 23, 2005. Id.

The record also contains reports from the two consulting physicians. On April 11, 2003, the Office of Disability Determinations referred Brown for evaluation to Dr. Graham, a board-certified doctor of internal medicine. R. 138-49. Brown told Dr. Graham that he last worked the previous year delivering tuxedos, that he spent the day doing "light activities," and that he "ha[d] no difficulty dressing, bathing, toileting or grooming." R. 138. Brown stated that he has had constant joint pain described as an "ache" in both knees and in his left shoulder, elbow, and hand, which caused him some difficulty in buttoning clothing and grasping objects. Id. He took Tylenol with Codeine which provided "some relief" from the pain. Id. Brown also related his history of sarcoidosis and complained of "some shortness of breath on physical exertion." R. 138-39. Brown had some intermittent epigastric discomfort but his symptoms improved by

taking Prilosec.  R. 139.

      Dr. Graham diagnosed joint pains, sarcoidosis, and peptic ulcer disease by history. R. 140-41.  He also found that Brown had a "mild limitation of function in the left knee," and a vision impairment.  Id.  Brown's prognosis was noted as "Stable," and he was able to "sit, stand, walk, lift, carry, handle objects, hear, speak and travel."  R. 141.  Dr. Graham stated, however, that Brown's activities "may be limited by shortness of breath."  Id.

      On August 7, 2005, Dr. Puri, an internal medicine specialist, performed an assessment of Brown's ability to do work-related physical activities.  R. 189-92.  Dr. Puri found that Brown was limited to lifting or carrying 50 pounds occasionally and 25 pounds frequently, and to standing or walking six hours in an eight hour workday.  R. 189.  Although Brown had no sitting limitations, he was affected in his ability to push or pull with his lower extremities.  R. 190.  Dr. Puri found that Brown was occasionally limited in climbing ramps, stairs, ladders, ropes, and scaffolding; kneeling; crouching; crawling; and stooping.  Id.  However, Brown was never able to balance.  Id.  Brown's manipulative functions, including reaching, handling, fingering, and feeling, as well as his visual and communicative functions were found to be "unlimited."  R. 191. Also, his ability to work was not limited by environmental factors, including temperature, noise, vibration, humidity, wetness, and hazards, but was limited by dust, fumes, odors, chemicals, and gases.  R. 192.

      On August 24, 2005, Dr. Puri examined Brown.  R. 193-99.  Brown told Dr. Puri that he had "constant pain in his chest since 1993," which "increase[d] at night and relieved with taking pain medication."  R. 193.  Brown also related his history of sarcoidosis and associated shortness of breath, and a history of asthma, which he had been experiencing for the past two months, and

6

which was decreased by using an inhaler.  Id.  He said that he had last seen a doctor one year ago and that he had made trips to the emergency room for treatment once or twice a year for his shortness of breath.  Id.  Brown complained of lower back pain which extended into his left knee, cervical neck, and left arm at times.  Id.  He stated that the pain was sharp and increased with movement and decreased with medication.  Id.  Brown was able to shower, bathe, dress himself, watch television, and to leave the home to socialize with friends.  R. 194.  Brown presented with a mild limp and had mild difficulty walking on his heels and toes.  Id.  His eyes, ears, nose, throat, neck, chest, lungs, heart, abdomen, neurologic functions, extremities, fine hand motor activity, and mental status were all normal.  R. 195-96.  Brown had some decreased flexion/extension in his lumbar spine and some decreased lateral and rotary movements.  R. 195.  Dr. Puri diagnosed sarcoidosis by history, as well as lower back pain and asthma.  R. 196.  Brown's chest x-ray was normal, and an EKG showed normal sinus rhythm with no acute changes.  Id.  Brown was given a prognosis of fair, and it was recommended that he not lift any heavy weights or be in an environment that might increase his respiratory complaints.  Id.

        2.        Hearing before ALJ

At a hearing before an ALJ held on July 25, 2005, Brown testified that he had been employed to deliver tuxedos since April 2004 and had been cut down to three days per week, working between eight to eight and one half hours per day.  R. 215, 218.  This position required Brown to carry five or six tuxedos at a time with shoes and accessories, either by foot, bus, or train.  R. 219.  Brown had been let go by his employer in 2002 or 2003, but had been rehired starting in 2004.  Id.  He was reduced to three days per week because he was missing days due to pain he was suffering.  R. 218-19.  While working, Brown experienced daily, intermittent pain in

the upper left side of his chest, arm, legs, and back.  R. 220.  Brown testified that he took Tylenol 4 with Codeine for relief.  Id.  He also testified that he had shortness of breath, which he treated by using a nebulizer and an Advair pump.  R. 220, 223.  When questioned by the ALJ, Brown stated that he had trouble grasping and holding things that were too heavy or even when he wrote.  R. 221.  Brown testified that he walked two blocks one or two times a week for exercise; was able to watch television or play cards; was able to dress himself, albeit with some pain; and could do "a little" sweeping, but could not mop.  R. 222.  He testified that he had to miss one month of work, in February 2005, due to the pain he was experiencing.  R. 223.  Brown also stated that it was difficult for him to work even the three days because he was often in pain.  See R. 223-24.

           3.      ALJ Findings and the Appeals Council's Denial of Review

On December 16, 2006, the ALJ issued a decision finding that Brown was not disabled and denying his application for disability benefits.  R. 18-26.  The ALJ determined that Brown had engaged in "substantial gainful activity" in 2004, subsequent to the filing of his claim, though not after 2004.  R. 18-19.  While Brown's medical problem resulted in a "severe" impairment, it did not meet or equal the criteria for any statutory impairment.  R. 19.  Rather, Brown retained "the functional capacity to perform medium work activity."  Id.  The ALJ noted that, although Brown suffers from sarcoidosis, his more recent chest x-rays in 2003 and 2004, "yielded unremarkable results," and that the record did not contain any recent pulmonary function tests.  Id.  The ALJ took into consideration that evidence contained in the record largely showed that although Brown experienced pain, it subsided with medication, and that he was given a note to return to work after he was out in January-February 2005.  R. 20.  Likewise, there

was no documentation to show that Brown's asthma constituted a severe impairment. R. 21. Although the record contained evidence that Brown might be limited by shortness of breath, the ALJ found that the record did not "establish that the claimant experiences shortness of breath which precludes performance of medium work activity." R. 20-21. With respect to hypertension, the ALJ found that Brown had never been hospitalized for this condition, and that while he had elevated blood pressure during examinations by Dr. Alonso, his blood pressure was only slightly elevated, and he did not complain of hypertension when examined by one of the consulting physicians. R. 22. Likewise, the ALJ found that Brown's history of peptic ulcer disease with epigastric pain did not result in a severe impairment. R. 23. The abdominal exams by the two consulting physicians culminated in a finding of unremarkable results. Id. Finally, the ALJ held that Brown's decreased visual acuity and his anxiety were not severe impairments. R. 23-24. Specifically, the ALJ's findings were as follows:

    1. There is evidence of substantial gainful activity in 2004.

    2. There is no evidence of substantial gainful activity subsequent to 2004.

    3. The claimant has the following severe impairment based upon the medical evidence: sarcoidosis.

    4. The claimant's impairment is not attended by clinical or laboratory findings which are the same as, or medically equivalent to, the criteria for any impairment described in Appendix 1, Subpart P, Regulation No. 4.

    5. The claimant's allegation of disability is not supported by the objective clinical findings.

    6. The claimant retains the functional capacity to perform medium work activity.

    7. There is sufficient evidence to support the findings regarding the claimant's residual functional capacity at step five and that evidence is explained in the rationale portion of the decision.

> 8. The claimant's impairment does not prevent him from performing his past relevant work as a clothing delivery worker.

R. 25.

In conclusion, the ALJ found that Brown's past relevant work "involved medium work activity," and he retained the ability to perform medium work activity, and therefore to be employed as a clothing delivery worker. Id.

On February 24, 2006, Brown sought review of the ALJ's opinion by the Appeal Council, R. 13, which denied his request for review on February 12, 2008, R. 7-10. In seeking review of his request, Brown submitted two new pieces of evidence: (1) a list of prescriptions that had been filled at his pharmacy from January 4, 2005 through January 4, 2006, R. 200-02; and (2) the results of a pulmonary function test performed on December 12, 2007 by Dr. Theodore Casper, R. 203-04. That test resulted in a lung capacity measurement of 48% of normal, a finding of mild to moderate obstructive dysfunction with air trapping, and a new diagnosis of emphysema. R. 204. A measurement of less than 40% of normal is a per se impairment. See 20 C.F.R. § 404, Subpart P, App. 1, Listing 3.02(C)(1).

The Appeals Council considered the new evidence submitted by Brown but found that it did not "provide a basis for changing the Administrative Law Judge's decision" because the pulmonary function test was conducted almost two years after the decision, and therefore did not relate to the disability period considered by the ALJ. R. 7.

B. The Instant Action

Brown filed his complaint in this Court on June 12, 2008, asserting the ALJ's decision was "erroneous, not supported by substantial evidence on the record, and/or contrary to the law." Compl. ¶ 9. The defendant filed the administrative record, see Answer, and moved for

judgment on the pleadings, see Notice of Motion, filed June 30, 2009 (Docket # 13); Defendant's Memorandum of Law in Support of His Motion for Judgment on the Pleadings, filed June 30, 2009 (Docket # 14) ("Def. Mem."). Brown then cross-moved for judgment on the pleadings, see Notice of Cross-Motion for Judgment on the Pleadings, filed Sept. 21, 2009 (Docket # 21); Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Sept. 21, 2009 (Docket # 22) ("Pl. Mem."). The defendant submitted a reply brief in support of his motion and in opposition to Brown's motion. See Defendant's Reply Memorandum of Law in Support of His Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings, filed Oct. 21, 2009 (Docket # 25).[2]

II.     DISCUSSION

   A.     Law Governing Social Security Claims

A court may set aside a decision of the Commissioner "only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (citation and internal punctuation omitted); accord Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)), cert. denied, 551 U.S. 1132 (2007). While the complaint asserts that the ALJ's decision was not supported by substantial evidence, Brown's memorandum in support of his cross-motion for judgment on the pleadings makes no such argument. Instead, Brown argues (1) that the ALJ failed to obtain certain treatment records from Dr. Alonso, Pl. Mem. at 15-18, and (2) that the Appeals Council erred in failing to consider two new pieces of evidence that he submitted, id. at

---

[2] Subsequent to the briefing, the Court sought the parties' view on a legal issue relating to the duty to develop the record. See Order, filed Mar. 2, 2010 (Docket # 26). The parties supplied responses by letter.

18-20. We deal with each argument separately.

  B.  Development of the Record

  It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case, Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000), and that remand is appropriate where this duty is not discharged, Rosa v. Callahan, 168 F.3d 72, 79, 82-83 (2d Cir. 1999). The non-adversarial nature of a Social Security hearing requires the ALJ "to investigate the facts and develop the arguments both for and against granting benefits." Sims v. Apfel, 530 U.S. 103, 111 (2000). The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity. See, e.g., Cruz v. Sullivan, 912 F.2d 8, 11-12 (2d Cir. 1990); Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755-56 (2d Cir. 1982). With respect to treating physician records, the governing statute provides that the Secretary "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. § 404.1512(d) ("we will develop your complete medical history for at least the 12 months preceding the month in which you file your application . . . . We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.").

  Brown contends that the record at his ALJ hearing was incomplete because the ALJ did not have "current" information from Dr. Alonso. Pl. Mem. at 15. He believes that information

from Dr. Alonso in the two years prior to the hearing (that is, between July 2003 and July 2005)

"could have changed" the ALJ's view as to his condition.  Id. at 17.

The facts relevant to this issue are as follows.  As of the date of the application, the agency had already obtained a number of records from Dr. Alonso dating from June 2001 until February 2003.  R. 110-37.  In June 2004, the ALJ issued a subpoena to Dr. Alonso seeking records from February 15, 2003 to the time of the subpoena, and also sent him a Residual Functional Capacity ("RFC") evaluation form.  R. 157-58.  Apparently, no records were received in response to that subpoena.  On the day of the hearing, July 25, 2005, Brown's attorney submitted a note from Dr. Alonso dated February 22, 2005.  R. 160, 161, 186.  In that note, Dr. Alonso stated that Brown had been "under [his] care" for the previous month.  R. 186.  A letter from Brown's attorney asked that the administrative record "be held open for three weeks after the hearing for submission of a current treating source report."  R. 162.  At the hearing, the ALJ asked Brown's counsel: "[C]an you get . . . me records and an RFC from Dr. Renaldo Alonzo [sic]?"  Brown's counsel stated: "Yes, I believe I can."  The ALJ said: "Okay.  One month okay?"  Brown's attorney replied: "Yes, Sir."  The ALJ stated: "Okay, August 25."  R. 221.

At the conclusion of the hearing, the ALJ stated that he would wait until he got the records from Dr. Alonso.  R. 224.  Almost two months later, on September 16, 2005, the ALJ had received no additional records from Brown's attorney and then wrote to him, again informing him that prior to any decision, Brown had the opportunity to submit "any additional records" for consideration "including a report from the treating physician."  R. 108.  The letter also informed Brown's attorney that he could request that the ALJ issue a subpoena for the

13

submission of records.  Id.  The letter concluded that if Brown did not respond to the letter within 10 days of receipt, the ALJ would assume that the record was complete for decision.  R. 109.  Brown's attorney did not respond to the letter.

Brown argues that the ALJ failed to "develop the record" in accordance with the prevailing case law in this circuit, Pl. Mem. at 16-17, noting that the ALJ's duty to develop the record exists even where a claimant is represented by counsel, id. (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).  The problem with Brown's argument is that the duty to develop the record extends only with respect to the 12-month period prior to the "filing date of the claimant's application for benefits."  Teverbaugh v. Comm'r of Social Sec., 2002 WL 32087466, at *4 (E.D. Mich. Dec. 30, 2002); accord 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application. . . ."); Tempesta v. Astrue, 2009 WL 211362, at *4 (E.D.N.Y. Jan. 28, 2009).  Here, Brown filed his application in March 2003, and the latest records from Dr. Alonso were from February 2003.  Indeed, Brown does not contend that there was any lack of records dating from prior to the application date.  Instead, he argues that the ALJ did not make efforts to obtain "current" records.  Pl. Mem. at 15.  This alleged failure, however, does not implicate the ALJ's duty to develop the record.  As one case has noted, "[w]hether additional medical evidence is necessary to adequately develop the record beyond that statutorily mandated by the Act is under the discretion of the ALJ."  Infante v. Apfel, 2001 WL 536930, at *7 (S.D.N.Y. May 21, 2001).

The ALJ's actions likely would not have been sufficient had the records at issue dated from the 12-month period prior to the application date.  See 20 C.F.R. § 416.912(d)(1) ("Every

reasonable effort means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination."); accord Rich v. Apfel, 1998 WL 458056, at *11 (S.D.N.Y. Aug. 5, 1998) ("'Every reasonable effort' means that the agency is required to make an initial request for evidence and one follow-up request." (quoting 20 C.F.R. § 416.912(d)(1))). But in this instance, the record contained extensive records from Dr. Alonso for the relevant time period. The Court cannot say that the ALJ's abused his discretion by not making efforts to seek directly from Dr. Alonso records for the period following the application date. Nothing before the ALJ suggested that such treatment records were necessarily material to the question of whether Brown was disabled as of March 2003.

      C.     Brown's New Evidence

Brown also argues that the Appeals Council failed to properly consider evidence that he submitted after the ALJ's decision denying his claim. See Pl. Mem. at 18-20. The new evidence consisted of a list of medications used by Brown from January 21, 2005 through December 24, 2005, R. 13, 200-202, and a pulmonary function test from December 2007, which showed mild to moderate obstructive dysfunction with air trapping and emphysema, R. 203-04.

The Appeals Council is only obligated to consider "new and material" evidence if it "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); accord Perez, 77 F.3d at 45. The Court may order that additional evidence be taken before the Commissioner, "but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record

in a prior proceeding." 42 U.S.C. § 405(g).  The Second Circuit has summarized this three part showing as follows:

> [A]n appellant must show that the proffered evidence is (1) "new" and not merely cumulative of what is already in the record, and that is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative.  The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide a claimant's application differently.  Finally, claimant must show (3) good cause for her failure to present the evidence earlier.

Lisa v. Sec'y of Health & Human Servs., 940 F.2d 40, 43 (2d Cir. 1991) (citations and internal quotation marks omitted) (first bracket in original).

The short answer to Brown's argument is that the proffered records related to treatment provided in 2005 and 2007 – many years after the period at issue.  Thus, these new records were not on their face "relevant to the claimant's condition during the time period for which benefits were denied." Id.  Nor did anything else in the record explain their relevance to Brown's condition.  With respect to the medication list, Brown merely stated that "[t]his is a chart of all the medicines that [he was] taking each and every day," R. 200, and that the drugs were used to treat "pain," "depression," and "muscle spasm," R. 13.  Although Brown complained of pain in his application, the submission of a list of medications alone, even if dosage amounts are included, provides no reliable information as to the severity or nature of his condition or as to his ability to perform his past relevant employment. Notably, the use of several of the drugs – e.g., Advair, Codeine, Ambien, Aciphex, Temazapam, Multivitamin, Folic Acid, Albuterol, and Flonase – was already included in the record and was therefore considered prior to the ALJ's decision. R. 194.

As for the pulmonary function test, Brown argues that it should have been considered

because it was the first test in the record that reflected testing of not only respiration, but gas exchange, which measures the ability of the lungs to transfer oxygen to the blood. Pl. Mem. at 18. In denying review of Brown's claim, the Appeals Council stated that this evidence did not "provide a basis for changing the Administrative Law Judge's decision" because the test was "dated almost 2 years after the decision and does not relate to the disability period considered by the Administrative Law Judge." R. 7.

Brown argues that the new evidence should have been considered despite the fact that it came into existence after the ALJ's decision because when "a diagnosis emerges after the close of administrative proceedings that sheds light on the seriousness of a condition evidence of that diagnosis is material and justifies remand." Pl. Mem. at 19 (citing Lisa, 840 F.2d at 44) (citation and internal quotation marks omitted). This argument, however, begs the question of whether this particular test shed light on Brown's past condition. There is no evidence or even allegation in the record that Brown was suffering from emphysema before the date of the ALJ's decision. Neither Dr. Casper, the testing physician, nor any other medical professional has indicated that Brown had this condition during the relevant time period. The only supporting statement to this effect is a letter from Brown's counsel, R. 205, which could properly be discounted as entitled to no weight.

In sum, the Appeals Council did not err in declining to review Brown's claim and take into evidence the submission of his medications list and the results of the 2007 pulmonary function test.

Conclusion

For the foregoing reasons, the Commissioner's motion for judgement on the pleadings

(Docket # 13) is granted and Brown's cross-motion for judgment on the pleadings (Docket # 21) is denied. The Clerk is requested to enter judgment dismissing the complaint.

Dated: May 3, 2010
      New York, New York

                                                                                      GABRIEL W. GORENSTEIN
                                                                                      United States Magistrate Judge

Copies mailed to:

William Gottlieb
Axelrod and Gottlieb LLP
100 Lafayette Street, Suite 304
New York, NY 10013

John E. Gura, Jr
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street, 3rd Fl.
New York, NY 10007

(Docket # 13) is granted and Brown's cross-motion for judgment on the pleadings (Docket # 21) is denied. The Clerk is requested to enter judgment dismissing the complaint.

Dated: May 3, 2010
       New York, New York

                                            GABRIEL W. GORENSTEIN
                                            United States Magistrate Judge

Copies mailed to:

William Gottlieb
Axelrod and Gottlieb LLP
100 Lafayette Street, Suite 304
New York, NY 10013

John E. Gura, Jr
U.S. Attorney's Office, S.D.N.Y.
86 Chambers Street, 3rd Fl.
New York, NY 10007